UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 17-21802-CIV-FAM

PABLO MICHEL RAMIREZ GONZALEZ )
and all others similarly situated under 29 )
U.S.C. 216(b), )
             )
    Plaintiff, )
 vs. )
             )
HOME NURSE CORP. d/b/a THE PALACE )
AT HOME, )
             )
    Defendant. )
_____ )

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW the Plaintiff, through undersigned counsel, and moves for partial summary judgment as follows:

**INTRODUCTION**

1. This matter sounds under the Fair Labor Standards Act (herein "FLSA" or the "Act"). Plaintiff seeks unpaid overtime wages, along with all fees and costs.

2. Plaintiff PABLO MICHEL RAMIREZ GONZALEZ ("Plaintiff") moves on two points: (1) Defendant HOME NURSE CORP. d/b/a THE PALACE AT HOME ("Defendant") was Plaintiff's FLSA employer, as Plaintiff was not an independent contractor; (2) Defendant is liable for at least some overtime wages, and therefore liability has been established.

1

## **MEMORANDUM OF LAW**

A. **SUMMARY JUDGMENT STANDARD.**

Pursuant to Fed.R.Civ.P. 56, a summary judgment should be granted if, following sufficient discovery, there is no genuine issue of material fact to be decided by a jury; therefore summary judgment is to be granted as a matter of law. *Hoffman v. Allied Corp., et al.,* 912 F.2d 1379, 1383-84 (11th Cir. 1990), *citing, Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining if a genuine issue exists, the court must query whether "a reasonable jury could return a verdict for the nonmoving party…." *Hoffman v. Allied Corp., et al.,* 912 F.2d at 1383. *See also, Beal v. Paramount Pictures Corporation*, 20 F.3d 454, 459 (11th Cir. 1994)("Summary Judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law"); *Silas v. Hillsborough County*, 2006 U.S. Dist. LEXIS 79503, *3-4 (M.D. Fla. 2006)(in FLSA matter court found "[s]ummary judgment is proper if following discovery … there is no genuine issue as to any material fact….").

B. **THE PLAINTIFF WAS NOT AN INDEPENDENT CONTRACTOR BUT RATHER AN EMPLOYEE UNDER THE FLSA.**

Plaintiff was not an independent contractor during the relevant employment period, but rather an employee as defined by 29 U.S.C. § 203(e)(1). An employee, as defined by 29 U.S.C. § 203(e)(1), is any individual employed by an employer. An employer includes any person acting directly or indirectly in the interest of an employer in relation to the employee. 29 U.S.C. § 203(d). An employment relationship is decided by applying the "economic realties test." *Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1319 (D. Fla 2001). In applying the "economic realities test," the Court should consider the following factors: (1) the nature and degree of control of the workers by the

alleged employer; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skills; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered required a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business.  *See, Santelices, supra.*

As set forth in Plaintiff Statement of Material Facts, during the hiring process, human resources first met with the Plaintiff, and then Plaintiff met with Lillian Diaz. Diaz ensured Plaintiff had proper certifications, valid license and "everything."  Diaz then confirmed Plaintiff's availability, his language, whether he was allergic to dogs or cats.  Diaz Deposition, P18, L15-25; P19.  The Defendant does a background check using fingerprints. Caceres Deposition, P11, L21-25.  Defendant continues to check the background every 5 years.  Chacon Deposition, P76, L8.  The corporate representative testified that after going through human resources, the next step would be an interview by Lillian Diaz (the private duty coordinator).  Plaintiff's initial interview would have been with Joan Veliz or perhaps an assistant such as Veronica Mejia.  Also, Defendants conduct a physical examination during the hiring process.  Defendant requires two reference letters.  Chacon Deposition, P21, L1-6; P32; P66; P75.  Such goes to prong (1) under *Santelices, supra,* the nature and degree of control of the workers by the alleged employer.  Defendant treated Plaintiff has an employee.  Further, The Defendant kept copies of Plaintiff's certifications in its files, after verified.  Also kept are the reference letters, CPR, background checks, insurance coverage records and social security verification.   Defendant notifies the state of Florida when the workers leave.  Chacon

3

Deposition, P74, L16-25; P78; P103.

Another example of control over Plaintiff was that, as Plaintiff states in is Affidavit: "I would regularly have to turn in a checklist regarding the tasks I performed. Usually every (2) weeks I faxed it to the Defendant, and it included payroll information." Plaintiff states in his Affidavit, "[i]f I wanted to take a vacation, I was required to request time off (via fax or e-mail) from my supervisor Lilian Diaz, and she would approve on behalf of Defendant." Allegedly the patient would tell the Defendant's "scheduler" who would then communicate same to the home health aide. Diaz Deposition, P37. The time sheets were turned into the "private duty scheduler'. Plaintiff had to sign in and out each day. Chacon Deposition, P97, L6-14; P98.

Diaz would perform home inspections regarding the home that Plaintiff performed work at, while Plaintiff was present in the home. Diaz Deposition, P29, L8-25. When asked what she discussed with the patient or families regarding the health aids [such as Plaintiff], Diaz said "[i]t depended", "depends on the case." However, Diaz was not forthcoming when asked for examples. Diaz Deposition, P33, L1-20 (*see also* line of questioning on PP31-32, 34). If the client/family wanted to get rid of the home health aide (not happy with the aide), they would tell Diaz to get someone else. Diaz Deposition, P34, 1-24. Capote testified that some health aides have been fired by the manager pursuant to an approval process. Capote Depositon, P23-24. *See also*, Chacon Deposition, P78, P79-83 regarding client complaints and investigation process. Such facts further show control of the Defendant over the Plaintiff—the clients were not Plaintiff's, and his job was dependent on Defendant's choices. The home health aide never brought their own clients to Defendant's company. All of the clients are the

4

Defendant's clients. Diaz Deposition, P41, L15-25, P42, L9-11.

With respect to prong (5), the degree of permanence of the working relationship, under *Santelices, supra.*, as indicated by Plaintiff's Affidavit, he started working for the Defendant on 9/12/14, and continues to work there. Thus, Plaintiff has worked for Defendant for over (3) years.

Diaz did not know if any of the health aides ever brought any of their own supplies or equipment to the patients' homes. Plaintiff was not a manager or supervisor. Defendant's business involves nurses and home-health aids assisting patients; they do nothing else. Diaz Deposition, P42, L17-25; P43. Thus, Diaz could not point to any supplies or equipment that Plaintiff provided to do his job, Plaintiff did not have a managerial role, and the work Plaintiff performed was integral to the type of business that Defendant operated. All of the workers are given a "private duty contractor" badge in the event they work in one of Defendant's buildings. Chacon Deposition, P107, L9-20; P108. In his Affidavit, Plaintiff states that "[t]he work that I did as described above was for Defendant's business, and my tasks performed were central and integral in relation to their business. Defendant's business involves taking care of patients, and my tasks were for the purpose of caring for those patients." Such goes to prongs (3) and (6) under *Santelices, supra.*

Chacon admitted the workers' wages were "fixed", when pressed as to whether Defendant allowed an opportunity for profit or loss. Allegedly the families might give the worker a gift. Chacon Deposition, P106-107. As indicated by the attached Orientation Statement for the alleged "Private Duty Aides/Independent Contractors" Page 4, it directs the workers "Do Not Accept Gifts", tips etc. Thus Chacon's testimony has

5

credibility issues as he tried to make it appear the workers could earn additional money on their own.  Chacon also provided questionable testimony when asked about the Orientation Statement.  *See*, Chacon Deposition, P147; P148.  Chacon cannot say the Orientation Statement is "legitimate", and when pressed responded "I don't know" when asked if he "can't say it's illegitimate…."  Chacon Deposition, P147; P148.  Chacon also argued the Orientation Statement only applies to "Private Duty Aides/Independent Contractors" that worked at the Defendant's facilities, not in the private homes.  Deposition, P148; P153.  Nevertheless, Chacon admitted that the contract that Defendant has with the private homes and Defendant's facilities is the same (except there is a separate contract executed for the patient's that live at the facilities).  Chacon Deposition, P154, L14-25; P155-156.  Moreover, Chacon admitted that the Plaintiff had worked at both Defendant's facilities "at times", and also at private homes.  Allegedly Plaintiff was only supposed to follow the rules when he worked at Defendant's facilities.  Chacon Deposition, P170, L24-24; P171.  In his Affidavit Plaintiff states: "I was given the Orientation Statement for the alleged "Private Duty Aides/Independent Contractors" when I started working on 9/12/14.  Lilian Diaz told me the only time I could accept a gift from the patients or the family would at Christmas."  Plaintiff was economically dependent on Defendant, and Defendant was the funding source.  Such facts also further show Defendant's control, and that Plaintiff did not have a profit/loss opportunity.  *See Santelices, supra*.

As indicated by the attached Orientation Statement for the alleged "Private Duty Aides/Independent Contractors", Defendant set forth various rules of control over the workers.  Such included various rules involving: Avoid Taking Personal Liberties, Days-

6

off Coverage, Dress Code, Work Hours, Meal Times, etc.  Chacon admitted the workers are "allowed" (3) breaks, during the (12) hour shift.  The "rule" is "60 minutes".  Chacon Deposition, P129, L19-25; P130; P131.  Such shows that Plaintiff was an FLSA employee, and Defendant exercised the requisite control.

When asked about discipline and reprimands in relation to home health aides, Frankie Capote testified there was a process in place if such issues were brought to his attention.  However, someone else would be responsible for writing up the home health aide, and a record would be kept.  Discipline was done "professionally" he recalled regarding an aide.  Some discipline was done verbal and some written.  Capote Depositon, P22, L1-25; P50-51.  According to Elena Garcia a scheduler, Plaintiff had a supervisor, who would exercise authority over him, and supervisory visits would be done.  Disciplinary action would be taken if an aide was negligent.  Garcia Deposition, P6; P15-16; P18.  Such is further evidence of Defendant's authority and control under prong (1) under *Santelices, supra.*

The health aides did not hire their own helpers.  Capote Deposition, P32, L11-14.  Plaintiff's Affidavit states: "During the relevant time period, I was not required to generate profit or loss through performance of managerial skills.  I had no opportunity in my position to increase/maximize my income through any type of loss/profit structure. I did not supervise anyone and had no management duties of any kind. I was not authorized to hire any "helpers" and I never paid any "helpers" to assist in my job duties and the completion of same.  On Christmas, the family I serviced gave me a gift, but the family did not pay me any additional money.  Only the Defendant paid me."  Such goes to prongs (2) and (3) under *Santelices, supra.*  Also such strongly goes towards Plaintiff's

7

favor under the economic realities test, as Plaintiff was paid by Defendant, was economically dependent, and Defendant was the funding source. *See, infra*, *Jeanneret v. Aron's E. Coast Towing, Inc.*, No. 01-8001-CIV, 2002 WL 32114470, at *2 (S.D. Fla. Jan. 29, 2002) *aff'd sub nom. Jeanneret v. Aron's E. Coast*, 54 F. App'x 685 (11th Cir. 2002), and *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1209 (11th Cir. 2003). The Defendant is the one that directly pays all of the home health care workers, including both the ones that work in Defendant's facilities and those that work in private homes. Chacon Deposition, P163; P225; P226. Thus, the Defendant was the funding source of Plaintiff's wages.

When Diaz worked as a "field nurse" for Defendant, she was an "employee" not an independent contractor. However, "[a]t the beginning", Diaz was an independent contractor "nurse". Diaz said "I don't know" when asked why some nurses are "independent contractors" and other "employees". Diaz also did not know if such concerned the issue of overtime pay. Diaz Deposition, P21, L11-25; P22. The Court should query as to why Defendant picks and chooses which workers are independent contractors; such appears to be arbitrary.

In *Jeanneret v. Aron's East Coast Towing*, the Eleventh Circuit affirmed the District Court's definition of an employer and employee under the FLSA. "Section 203(d) of the FLSA defines an "employer" as 'any person acting directly or indirectly in the interest of an employer in relation to an employee.' It further defines 'employee' as 'any individual employed by and employer.'" *Jeanneret v. Aron's E. Coast Towing, Inc.*, No. 01-8001-CIV, 2002 WL 32114470, at *2 (S.D. Fla. Jan. 29, 2002) *aff'd sub nom. Jeanneret v. Aron's E. Coast*, 54 F. App'x 685 (11th Cir. 2002).

8

"To 'employ' means 'to suffer or permit to work." *Id*. Determination of employment status under the FLSA is a question of federal law. *Id*. Whether an employment relationship exits under the FLSA must be judged by the 'economic realities' of the individual case and not by traditional common-law principles. *Id*.

The Eleventh Circuit stated that "in entertaining and assessing the evidence relevant to the inquiry called for by a given factor, the question the district court must ask itself is whether such evidence, considered as a whole, supports (or fails to support) the laborer's claim that he is **economically dependent** on the putative employer…." *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1209 (11th Cir. 2003)(emphasis added). Plaintiff states in is Affidavit: "I started working for Defendant on 9/12/14, and still I work there. I have had no other jobs while employed by the Defendant and I was completely economically dependent on the Defendant for my livelihood, as I had no other source of income."

In *Jeanneret v. Aron's E. Coast Towing*, 2002 U.S. Dist. LEXIS 12200, 19-20 (S.D. Fla. 2002)(emphasis added), this Court noted that part of the inquiry concerns "whether the putative employer was involved in the preparation of payroll and the payment of wages to the workers. *See id*. According to the *Antenor* Court, this factor is probative of joint employment because of the likelihood that "when a business undertakes to help an independent contractor (in this case, Aron's) prepare its payroll and pay its wages, it is likely that the **contractor lacks economic substance** on which the workers can solely depend.*" See Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996)(emphasis added).

Further, in *Jeanneret* this Court stated that "[i]f Sunshine made payments regardless

9

of whether it first received payment from Aron's, that would tend to indicate that Aron's lacked economic substance, and that the employees were economically dependent on Sunshine. But the plaintiff has neither alleged nor proffered any evidence tending to prove that Sunshine made payroll payments regardless of whether it first received corresponding funds. Therefore there is little evidence under this factor tending to prove joint employment." *Id*. at *22-23 (emphasis added).   Thus, part of Plaintiff's argument is that Defendant was the true funding source with economic substance in relation to Plaintiff's (and the other home health aids') employment with the Defendant, in line with *Jeanneret, supra.*

C. **THE COURT SHOULD FIND THAT LIABILITY HAS BEEN ESTABLISHED, AND THAT DEFENDANT OWES PLAINTIFF UNPAID OVERTIME WAGES.**

The case at bar concerns the method by which Plaintiff's rate of pay should be determined. It is Plaintiff's position that he understood that during the relevant period he was paid on a daily rate. Defendants on the other hand claim Plaintiff was paid on an hourly basis.

Analogously, "[if] the employee is employed solely on a weekly salary basis, his regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is **intended to compensate**. If an employee is hired at a salary of $182.70 and if it is understood that this salary is compensation for a regular workweek of 35 hours, the employee's regular rate of pay is $182.70 divided by 35 hours, or $5.22 an hour, and when he works overtime he is entitled to receive $5.22 for each of the first 40 hours and $7.83 (one and one-half times $5.22) for each hour thereafter. If an employee is hired at a salary of $220.80 for a 40–hour

10

week his regular rate is $5.52 an hour." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1268-69 (11th Cir. 2008)(emphasis added).

Also, The Eleventh Circuit Pattern Jury Instructions also state that "The employee's regular rate for one week is the basis for calculating any overtime pay due to the employee. Unless a specific hourly rate was agreed upon, the "regular rate" for a week is determined by dividing the total wages paid for the week by the total number of hours the weekly salary was **intended to compensate**. To calculate how much overtime pay was owed to the Plaintiffs for a certain week, subtract 40 from the total number of hours they worked and multiply the difference by the overtime rate. Defendants failed to pay the Plaintiffs the required overtime pay if the Defendants paid Plaintiffs less than that amount." 11th Circuit Pattern Jury Instruction (Civil Cases) 2013, 4.14 (emphasis added).

Mr. Chacon claimed the "overtime rate is calculated into the way that we pay" based on minimum wage. Chacon Deposition, P42, L17-22. However, Defendant charges the client $15 per hour. However, if the shift exceeds nine hours, **then the client is charged $140 for the shift** (if the shift does not exceed 12 hours). Chacon Deposition, P56; P57, L1-14. <u>Such shows a per shift payment structure</u>.

Analogously, Plaintiff refers to the test regarding the fluctuating workweek theory, because such deals with a determination of how the employee's wages should be determined for purposes of overtime damages. "In order for an employer to utilize the FWW method: 1) the employee's hours must fluctuate from week-to-week; 2) the employee must receive a fixed weekly salary that remains the same, regardless of the number of hours worked during the week; 3) the fixed amount must be sufficient to compensate for all hours actually worked in a week at a rate not less than the legal

11

minimum wage (fixed weekly salary divided by total hours worked in a week); 4) **the employee must have a clear "mutual understanding" with the employer that he will be paid the fixed salary, regardless of the number of hours worked**; and 5) the employee must be paid, in addition to the salary, overtime for all hours over 40 in a given week at a half-time rate. *See Teblum v. Eckerd Corp. of Fla., Inc.,* 2006 WL 288932, at *3 (M.D.Fla. Feb.7, 2006); *Davis,* 2003 WL 21488682, at *1." *Lewis v. Keiser Sch., Inc.*, 162 Lab. Cas. P 36064 (S.D. Fla. 2012)(emphasis added).

Case law such as *Lewis, supra* is relevant to consider in the case at bar, particularly regarding the prong concerning "mutual understanding".   As discussed above in *Farm Stores Grocery, Inc.* and 11th Circuit Pattern Jury Instruction (Civil Cases) 2013, 4.14, the Court must determine what Plaintiff's pay was intended to compensate. In *Lewis,* this Court stated that "[i]n this case, by contrast, Lewis's paystubs did not contain the same information—they did not show the number of hours worked or the base amount of pay. While the Court recognizes that an FLSA plaintiff need not understand all the details and contours of how his pay is calculated, Lewis's paystubs did not contain the same level of information as in *Davis.* As such, the Court cannot say that Lewis's paystubs taught her the same "lesson."  *Lewis v. Keiser Sch., Inc.*, 162 Lab. Cas. P 36064 (S.D. Fla. 2012).   This Court in *Lewis* went on to say, "[i]n this case, there is conflicting evidence as to what sort of understanding Lewis had about her salary and overtime compensation. It shall be the jury's task to decide the significance of, and the inferences to be drawn from, the language in the employment policy manuals Lewis received (or did not receive), the notation ("Default Hours: 80") on Lewis's new hire form, the fact that her paystubs did not reflect the number of hours she worked or the rates of her pay,

Lewis's purported lack of inquiry as to the method of compensation, and any other relevant indicia of her understanding." *Lewis v. Keiser Sch., Inc.*, 162 Lab. Cas. P 36064 (S.D. Fla. 2012). In cases such as *Lewis*, the court may decide that, given the facts, evidence such as the paystubs would instruct the employee to understanding the method of compensation (in relation to mutual understanding requirement).

This Court should also consider the *Martin* case which stated that "[i]In support of this argument, SPC points to 29 C.F.R. § 778.114(a) and multiple circuit and district court cases applying this provision to award overtime compensation on a half-time, rather than time-and-a-half, basis. *Martin v. S. Premier Contractors, Inc.*, 21 Wage & Hour Cas. 2d (BNA) 1462 (N.D. Ga. 2013). The Court was discussing Section 778.114, which is a fluctuating workweek regulation, concerning half time versus time and one-half damages in relation to exemption issues. The court noted that "[t]he proper determination of that rate is therefore of prime importance.' " *Id.* (quoting *Walling,* 325 U.S. at 424). *Martin v. S. Premier Contractors, Inc*., 21 Wage & Hour Cas. 2d (BNA) 1462 (N.D. Ga. 2013). In light of *Martin*, this Court should analogously analyze the case at bar in light of law relevant to the fluctuating workweek particularly with respect to "mutual understanding"

Very importantly, "[h]owever, **"a fixed salary will not be deemed to include an overtime component <u>in the absence of an express agreement to that effect</u>."** *Marshall v. R & M Erectors, Inc*., 429 F. Supp. 771, 780 (D. Del. 1977); *see Wirtz v. Leon's Auto Parts Co.*, 406 F.2d 1250, 1252 (5th Cir. 1969) (finding that FLSA requires "an explicit understanding between the parties as to the existence of a regular wage rate that is stepped up for overtime hours"); *Amaya v. Superior Tile and Granite Corp.*, 2012 WL

13

130425, at *9 (S.D.N.Y. Jan.17, 2012) ("An agreement for a fixed weekly salary for more than 40 hours of work per week only complies with the FLSA and Labor Law if there is an explicit understanding between the employer and employee as to regular and overtime rates."). There is no evidence here, in the employment contract or elsewhere, of such an express agreement." *Fresh v. Diamond Dev. & Investments Inc.*, 1:13-CV-2657-WSD, 2016 WL 2745836, at *6 (N.D. Ga. May 11, 2016). When a private duty contractor is hired, they sign an initial Rates Agreement (such was marked as Plaintiff's Exhibit B, Bates numbers 29-32. Caceres said "[w]e briefly explain to them the rates." The new-hires only sign the "initial rates agreement." Caceres would not explain anything beyond what is in the Rate Agreement. Caceres Deposition, P4; P5, L1-4; P6; P7; P8; P9, L15-23. *See* attached Rates Agreement. As indicated by the Rates Agreement, **only the first page is signed by the Plaintiff**[1]; the agreements for **subsequent years attached as addendums are not signed**.

The Rates Agreement was discussed at Chacon's deposition, and he admitted the workers are not required to sign each year. They only sign when first hired to work. Plaintiff signed the Agreement on 9/12/14. The amount per shift is displayed on the sheet so the worker knows how much is paid "for a 12-hour shift". Allegedly it is "easier" for the worker to be told how much is paid "per shift". Chacon Deposition, P85; P86; P87; P88.

Plaintiff states in his Affidavit that "[w]ith respect to the attached Rates Agreement, I only signed the first page dated 9/12/14, and never signed any of the Addendums for 2015, 2016 or 2017 that changed the pay rate. At no time did the

---

[1] This Rate Agreement is dated in 2014, which precedes the claim period for this case (1/1/15-2/17/17).

14

Defendant ever show me the Addendums prior to this lawsuit—the first time I saw them was when I was deposed in this case. As indicated by the attached Payroll Detail Report from 1/16/17-1/31/17, the only rate of pay displayed is the shift rate (ex. $110.51). Another example is the attached Pay Rates Calculator Detail Report that indicates a shift rate from March 2015 (ex. $109.85 per visit). Also attached are some exemplary paystubs from 1/20/16 and 1/19/17, to show that the Defendants never set forth the number of hours and did not reference overtime. Also attached is a Welcome to the Palace at Home's Private Duty Department that I was given when I started working on 9/12/14. On page 2, the Pay Rate is displayed as $11.90 per hour for 1 hour-8 ½ hours, or $108.50 per daily shift (9-12 hours). When I first started I was given (4) hour shifts at $11.90 per hour, however, to the best of my recollections, near the end of 2014 or the beginning of 2015, I was assigned to begin (12) hours shifts. At that time, it was my understanding that I was then being paid $108.50 per daily shift because I was working (12) hours. I believe from that point on I was always paid on a daily shift rate. As stated, I never signed any of the Addendums for 2015, 2016 or 2017, and I never saw them prior to this lawsuit."

Plaintiff states in his Affidavit that "I have reviewed Defendant's Response to Plaintiff's Statement of Claim [DE 17] and refer to same. For example, 3/22/15-3/28/15 shows 77 hours worked, but 44 overtime hours. The reason for that is that I worked 7 days, 12 hour shifts each day. Such totals (84) hours, and Defendants allege they paid me for a (1) hours break period."

Plaintiff states in his Affidavit that "Regarding my claim, I seek half-time overtime damages, as I seek the Jury to find that Defendant did not pay me my overtime.

15

I believe that my total hours per week should be divided by the amount I was paid per week to determine my hourly rate (as I was not legally paid on an hourly basis as alleged by Defendant after I began working 12 hour shifts). I seek the Jury to find that I was paid straight time (i.e. the same rate for every hour worked including both the regular and overtime hours), and I should be awarded ½ time for all of my overtime accordingly. For example, when I was paid $110.51 per shift and worked 7 days, with 12 hours shifts, such equates to $773.57 per week. $773.57/84 hours = $9.20 per hour.   Therefore I would seek ½ time damages for all overtime hours based on that hourly rate."

As stated, "[h]owever, **"a fixed salary will not be deemed to include an overtime component in the absence of an express agreement to that effect."** *Marshall v. R & M Erectors, Inc.*, 429 F. Supp. 771, 780 (D. Del. 1977); *see Wirtz v. Leon's Auto Parts Co.*, 406 F.2d 1250, 1252 (5th Cir. 1969) (finding that FLSA requires "an explicit understanding between the parties as to the existence of a regular wage rate that is stepped up for overtime hours"); *Amaya v. Superior Tile and Granite Corp.*, 2012 WL 130425, at *9 (S.D.N.Y. Jan.17, 2012) ("An agreement for a fixed weekly salary for more than 40 hours of work per week only complies with the FLSA and Labor Law if there is an explicit understanding between the employer and employee as to regular and overtime rates."). There is no evidence here, in the employment contract or elsewhere, of such an express agreement." *Fresh v. Diamond Dev. & Investments Inc.*, 1:13-CV-2657-WSD, 2016 WL 2745836, at *6 (N.D. Ga. May 11, 2016).  In light of the Plaintiff's above-referenced Affidavit, and the fact that it is undisputed he never signed the Addendums for the subsequent years, the Court should find as a matter of law the

16

Plaintiff is entitled to overtime damages, and that Defendant is liable for at least some overtime damages. Thus, the trial should at most only be as to damages.

WHEREFORE, THE PLAINTIFF REQUESTS THE COURT TO FIND THAT PLAINTIFF WAS DEFENDANT'S "EMPLOYEE" UNDER THE FLSA AND NOT AN INDEPENDENT CONTRACTOR, AND ALSO THAT DEFENDANT IS LIABLE FOR OVERTIME DAMAGES AS A MATTER OF LAW.

**Respectfully submitted,**

**J.H. ZIDELL, ESQ.
J.H. ZIDELL, P.A.
ATTORNEY FOR PLAINTIFF
300 71ST STREET, #605
MIAMI BEACH, FLA. 33141
PH: 305-865-6766
FAX: 305-865-7167
EMAIL: ZABOGADO@AOL.COM
F.B.N. 10121
BY:____/s/ J.H. ZIDELL_____
J.H. ZIDELL, ESQ.**

**CERTIFICATE OF SERVICE:**

**I HEREBY CERTIFY THAT A TRUE AND CORRECT COPY OF THE FOREGOING WAS SENT 11/3/17 VIA CM/ECF TO:**

**ALL CM/ECF RECIPIENTS**

**MILLER, KAGAN, RODRIGUEZ, & SILVER PL
201 ALHAMBRA CIRCLE, STE. 802
CORAL GABLES, FL 33134**

**BY:_____/s/ J.H. ZIDELL_____
J.H. ZIDELL, ESQ.**