UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 17-21802-CIV-MORENO

PABLO MICHEL RAMIREZ GONZALEZ,
and all others similarly situated,

      Plaintiff,

vs.

HOME NURSE CORP. d/b/a THE PALACE
AT HOME, JACOB SHAHAM, and HELEN
SHAHAM,

      Defendants.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pablo Michel Ramirez Gonzalez brought this suit alleging that from January 1, 2015 through February 17, 2017, The Palace at Home failed to pay him the proper overtime premium required under the Fair Labor Standards Act. Gonzalez moved for partial summary judgment, asserting that (i) he qualifies as a Palace employee rather than an independent contractor, and (ii) "Defendant is liable for at least some overtime wages." (D.E. 29, at 1.) Palace filed a cross motion for summary judgment, contending that (i) Gonzalez worked as an independent contractor, and regardless, (ii) Palace paid Gonzalez the appropriate and lawful premium for overtime hours worked.

The Court need not address whether Gonzalez qualifies as an employee or independent contractor. Even assuming he worked as a Palace employee, the undisputed facts indicate that Palace properly compensated Gonzalez for all regular and overtime hours. Accordingly, the Court grants Palace's motion for summary judgment.

## I. **Background**

The Palace at Home is a home health agency that, among other things, refers home health aides to patients who need additional help in their everyday lives. Pablo Michel Ramirez Gonzalez is a certified home health aide who attends to the elderly. He prepares meals, administers medications, helps with bathing and dressing, and otherwise offers support, comfort, and companionship.

On September 12, 2014—the day Gonzalez began working for Palace—Gonzalez received a document titled "The Palace at Home Rates Agreement." (D.E. 30-1, at 9.) The Rates Agreement explained how Palace compensated home health aides who—like Gonzalez—work 12-hour shifts. It detailed the regular (non-overtime) rate as well as the overtime premium rate for 12-hour shifts and included explicit language requiring Gonzalez to acknowledge both the "agreed hourly rate" and the "pay rate structure" prescribed in the Agreement. Specifically, the Rates Agreement stated:

> *I do hereby understand that the agreed hourly rate for my assigned job is $7.93 per hour. I also understand that when I get (sic) job assigned, I will be pay (sic) according to the following:*
>
> *12 Hour Shifts*
>
> *60 minutes of breaks included per shift*
>
> *11 working hours per shift/day X 7 days per week = 77 hours per week*
>
> *40 hours at $7.93   = $317.20*
> *37 hours at $11.90  = $440.30*
> *                    ----------*
> *          $757.50 per week that would be paid at $108.50/shift*
>
> *I fully understand and agree to the pay rate structure as personally discussed with me.*

(*Id.*) Immediately below this compensation explanation (and on the same page), Gonzalez provided his signature certifying he understood the terms of the Rates Agreement. Gonzalez specifically acknowledged that his signature reflects an understanding that Palace would

compensate him pursuant to a pay rate formula that included a regular rate component equal to Florida's minimum wage ($7.93 for the first 40 hours worked) and an overtime rate component ($11.90[1] for the 37 overtime hours worked). (*Id.*; *see also* Gonzalez Dep. 44:7–45:25.) Gonzalez concedes that he had the opportunity to read the Agreement, he did not ask any questions about the Agreement, and he was not under any duress or threat to sign the Agreement. (*Id.* 43:5–44:2.) When asked whether he had any reason to believe that Palace paid him incorrectly while the Rates Agreement was in effect, Gonzalez admitted, "I don't know." (*Id.* 48:2–48:18.)

Effective January 1, 2015, Florida increased its minimum wage from $7.93 per hour to $8.05 per hour. In response, Palace issued the "2015 Minimum Wage Addendum to Rates Agreement," reflecting the increased regular rate of $8.05 and increased overtime premium rate of $12.08. (D.E. 30-6, at 2.) The 2015 Addendum provides the following explanation of compensation for 12-hour shifts:

> *New agreed hourly rate for assigned job is $8.05 per hour.*
>
> *12 hour shifts*
>
> *60 minutes of breaks included per shift*
>
> *11 working hours per shift/day X 7 days per week = 77 hours per week*
>
> *40 hours at $8.05    = $322.00*
> *37 hours at $12.08   = $446.96*
> *-----------*
> *$768.96 per week that would be paid at $109.85/shift*

(*Id.*)

Unlike the Rates Agreement, Gonzalez did not sign the 2015 Addendum. Indeed, he contends that he never saw the 2015 Addendum until Palace presented it to him at his deposition. (Gonzalez Dep. 52:24–53:2.) However, as evidenced in the March 2015 payroll report provided by Gonzalez, Palace paid Gonzalez $109.85 for each 12-hour shift worked during that period.

---

[1] The overtime rate equates to 1.5 times the regular rate.

3

That daily rate matches the daily shift rate stated in the 2015 Addendum. And Palace computed the daily shift rate using the regular rate of $8.05 for non-overtime hours and the overtime premium rate of $12.08 for work in excess of 40 hours per week. When asked whether he had any reason to believe that Palace paid him the incorrect amount for his work in 2015, Gonzalez again conceded, "I don't know." (Gonzalez Dep. 50:25–51:4.)

Florida did not increase the minimum wage in 2016. However, Palace still issued a "2016 Minimum Wage Addendum to Rates Agreement" reflecting the same regular rate of $8.05 and overtime premium rate of $12.08. (D.E. 30-6, at 3.) Gonzalez did not sign the 2016 Addendum and he maintains that he first saw this document at his deposition. (Gonzalez Dep. 52:24–53:2.)

Effective January 1, 2017, Florida increased the state minimum wage from $8.05 per hour to $8.10 per hour. Once again, Palace updated its compensation rates. It issued the "2017 Minimum Wage Addendum to Rates Addendum" reflecting the regular hourly rate increase from $8.05 to $8.10 and the overtime premium rate increase from $12.08 to $12.15. (D.E. 30-6, at 2.) The 2017 Addendum provides the following compensation details for 12-hour shifts:

> *New agreed hourly rate for assigned job is $8.10 per hour.*
>
> *12 hour shifts*
>
> *60 minutes of breaks included per shift*
>
> *11 working hours per shift/day X 7 days per week = 77 hours per week*
>
> *40 hours at $8.10   = $324.00*
> *37 hours at $12.15  = $449.55*
> *                      ----------*
> *                      $773.55 per week that would be paid at $110.51/shift*

(*Id.*)

Once again, Gonzalez did not sign the 2017 Addendum and claims he never saw the document before his deposition. (Gonzalez Dep. 52:24–53:2.) However, the payroll report from January 2017 shows that Palace paid Gonzalez $110.51 for each 12-hour shift worked during

that period. Here too, that daily shift rate matches the shift rate listed in the 2017 Addendum. Palace calculated that shift rate using the regular rate of $8.10 for non-overtime hours and the overtime premium rate of $12.15. When asked whether it was "accurate" that he was "paid 40 hours at a regular rate of $8.10 and an overtime rate for 37 hours at $12.15" in 2017, Gonzalez stated: "That's correct[.]"[2] (Gonzalez Dep. 52:20–52:24.)

Gonzalez does not dispute the validity of the 2015, 2016, and 2017 Addendums. Nor does he allege that the compensation breakdown detailed in each Addendum is a sham. He simply claims that he never saw the Addendums before this lawsuit.

## II. Summary Judgment Standard

Summary judgment is authorized where there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The non-movant must present more than a scintilla of evidence in support of the non-movant's position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). A jury must be able reasonably to find for the non-movant. *Id.* Ultimately, the court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

---

[2] To be sure, Gonzalez included a caveat: "I would also like to add that this has caught me by surprise since I had not seen the documents for 2015, 2016 and 2017." (Gonzalez Dep. 52:24–53:2.) But whether he had, or had not, seen the Addendums does not negate his concession that he was "paid 40 hours at a regular rate of $8.10 and an overtime rate for 37 hours at $12.15" in 2017. (*Id.*)

5

### III. Statutory Framework

The Fair Labor Standards Act requires employers to pay their employees 1.5 times the regular rate of pay for all work performed in excess of 40 hours per week. *See* 29 U.S.C. § 207(a)(1). When an employer provides "extra compensation . . . by a premium rate paid for certain hours worked by the employee in any day . . . because such hours are hours worked in excess of eight in a day," 29 U.S.C. § 207(e)(5), that extra compensation "shall be creditable toward overtime compensation." 29 U.S.C. § 207(h)(2); *see also* 29 C.F.R. § 778.202. Even where the employer customarily pays employees for hours that they did not work, "it is permissible (but not required) to count these hours as hours worked in determining the amount of overtime premium pay, due for hours in excess of 8 per day . . . which may be . . . credited toward the statutory overtime compensation." 29 C.F.R. § 778.202(a).

### IV. Discussion

Palace roots its motion for summary judgment in a simple premise: "Plaintiff was paid for all regular hours at the statutory (*Florida*) minimum wage and for all overtime hours at one and one half times that amount." (D.E. 42, at 1.) Gonzalez, however, insists that Palace violated the Fair Labor Standards Act. To manufacture that violation, he has routinely remodeled his allegations, contradicted himself, misapplied facts, misconstrued law, and otherwise ignored the obvious. The evolution of Gonzalez's vague, shifting, and ultimately desperate claim begins with the following allegations in his Complaint:

> 20. Between the period of on or about January 1, 2015 through on or about March 1, 2015, Plaintiff worked an average of 48 hours a week for Defendants and was paid an average of $9.16 per hour but was never paid the extra half time rate for any hours worked over 40 hours in a week as required by the Fair Labor Standards Act. Plaintiff therefore claims the half time overtime rate for each hour worked above 40 in a week.
>
> 21. Between the period of on or about March 2, 2015 through on or about February 17, 2017, Plaintiff worked an average of 84 hours a week for Defendants, and was paid an average of $9.16 per hour but was never paid the extra half time rate for any hours worked

6

>
> over 40 hours in a week as required by the Fair Labor Standards Act. Plaintiff therefore claims the half time overtime rate for each hour worked above 40 in a week.

(Compl. ¶¶ 20–21.)

Gonzalez eventually contradicted these allegations at his deposition when he conceded that, in 2017, he was "paid 40 hours at a regular rate of $8.10 and an overtime rate for 37 hours at $12.15." (Gonzalez Dep. 52:20–52:24.) Undeterred by his apparent acknowledgment that Palace, in fact, ***did not*** violate the Act, Gonzalez pivoted. On November 2, 2017—six months after filing his Complaint—he submitted an Affidavit stating that Palace paid him a "daily shift rate" that progressively increased from $108.50 in January 2015 to $110.51 in February 2017. (D.E. 30-1, at 2–3, ¶¶ 10, 12.) Again, Gonzalez's new assertions conflict with his Complaint allegations that Palace compensated him ***by the hour*** at a ***static $9.16 hourly rate*** for that same two-year period.

Ultimately, Gonzalez contends that "Defendant is liable for ***at least some*** overtime wages[.]" (D.E. 29, at 1 (emphasis added).) He offers two equally conclusory bases to support this final (rather desperate) plea. First, he states, "I believe that the Defendant did not pay me my overtime" because "I believe . . . I was always paid on a daily shift rate" and therefore, "I believe that my total hours per week should be divided by the amount I was paid per week to determine my hourly rate." (D.E. 30-1, at 3, ¶ 12; *see e.g.,* D.E. 30-1, page 3, ¶12 ("For example, when I was paid $110.51 per shift and worked 7 days, with 12 hours (sic) shifts, such equates to $773.57 per week. $773.57/84 hours = $9.20 per hour.").) Second, Gonzalez contends that even if Palace's compensation included an overtime premium, he did not agree to the overtime component, so it cannot count as overtime compensation. (D.E. 30-1, at 3, ¶ 11 ("I never signed any of the [Rates] Addendums for 2015, 2016 or 2017, and I never saw them prior to this lawsuit.").) Under either theory, no reasonable jury could find for Gonzalez.

7

### A. <u>Regular Rate and Overtime Premium Included in Daily Shift Rate</u>

The Fair Labor Standards Act offers no support for Gonzalez's suggestion that because Palace compensated him using a daily shift rate, Palace did not pay him the proper overtime premium for work performed in excess of 40 hours per week. Rather, the Fair Labor Standards Act allows employers to credit daily overtime premiums toward fulfillment of the weekly overtime requirement. *See* 29 U.S.C. § 207(h). His argument, therefore, reflects either a fundamental misunderstanding of the Act's overtime compensation provisions, or a bad faith attempt to recover on a truly frivolous claim.

Palace has produced considerable evidence supporting its assertion that the daily shift rate included an overtime premium for hours worked in excess of 40 per week. To begin, the Rates Agreement explicitly states Palace would assign Gonzalez 77 hours of paid work per week, and would compensate him at Florida's minimum wage for the first 40 hours, and 1.5 times Florida's minimum wage for the remaining 37 hours. During his deposition, Gonzalez confirmed that the Rates Agreement "[told] [him] exactly how [his] pay [would] be determined when [he] worked 12 hour shifts." (Gonzalez Dep. 44:7–44:14.) He also admitted he understood the Rates Agreement "well enough to put [his] signature on it." (*Id.*)

Although Gonzalez claims he never signed or saw the 2015, 2016, and 2017 Addendums to the Rates Agreement, he agreed they explain how Palace computed daily shift compensation during each year. Notably, he admitted that each document identifies the regular hourly rate (minimum wage) and overtime premium rate (1.5 times minimum wage), and describes how the regular rate and overtime premium rate were used to calculate the daily shift rate. Finally, Gonzalez admits that the payroll detail reports attached to his motion for summary judgment display the shift rate he was paid for the given period. And "[a]lthough the records do not expressly state the breakdown between hours paid at the regular rate and hours paid at the 1.5 overtime rate within the fixed daily rate, the listed rates clearly corroborate [Palace's] explanation of the breakdown of the daily rate." *Seraphin v. TomKats, Inc.*, No. 11-CV-4382 FB

LB, 2013 WL 940914, at *2 (E.D.N.Y. Mar. 11, 2013) (holding that daily rate of pay complied with the Fair Labor Standards Act where the daily rate included an overtime premium).

Here, as in *Seraphin v. Tomkats*, Gonzalez "has not offered any reason to question [Palace's] logical, substantiated explanation for the daily rate." 2013 WL 940914, at *2. And despite vigorously insisting that he never saw the 2015, 2016, and 2017 Addendums before the lawsuit, he does not question their authenticity. *Id.* ("In cases where courts have questioned the employers' assertions that a fixed rate included an overtime premium, there was evidence of suspicious bookkeeping errors, . . . evidence of backward-adjusting, . . . a lack of evidence that the hourly rate was ever used, . . . or some other evidence to suggest that the practice was a sham."). Nor does Gonzalez allege that the payment structure described in the Rates Agreement and Rates Addendums created an unlawful "split day" plan comprised of artificial divisions. *See* 29 C.F.R. § 778.501(a)–(b) (noting, for example, that a "division of the normal 8-hour workday into 4 straight time hours and 4 overtime hours is purely fictitious").

Finally, the evidence that inflicts the most damage to Gonzalez's case—and, indeed, calls into question its very initiation—materialized from several almost identical exchanges over the course of his deposition. Three separate times, Gonzalez either confirmed the absence of, or admitted he does not know of, "any reason to believe that [he was] paid incorrectly by The Palace at Home."

> Q. Do you have any reason to believe that you were paid incorrectly by The Palace at Home while this rate agreement was in effect?"
>
> A. I don't know.

(Gonzalez Dep. 48:2–48:18.)

> Q. For the year 2015, do you have any reason to believe that the amount you were paid by The Palace at Home for your work was incorrect?
>
> A. I don't know.

9

(Gonzalez Dep. 50:25–51:4.)

> Q. So am I accurate that you were paid 40 hours at a regular rate of $8.10 and an overtime rate for 37 hours at $12.15?
>
> A. That's correct.[3]

(Gonzalez Dep. 52:20–53:2.)

Accordingly, Gonzalez's primary argument—that because Palace paid him a daily rate for each 12-hour shift, Palace did not pay him the proper overtime premium for work performed in excess of 40 hours per week—lacks any merit under the Fair Labor Standards Act. And even if the Act did recognize that argument, Gonzalez admitted that Palace's compensation included an overtime premium. As such, no reasonable jury could find in his favor.

### B. Mutual Agreement that the Daily Shift Rate Included an Overtime Premium

Unable to refute Palace's contention that it did, indeed, compensate Gonzalez at a premium for his overtime hours, Gonzalez turns to his equally meritless assertion that Palace's overtime payments were invalid simply because he did not know the daily shift rate included an overtime premium. This argument fails for two reasons. First, Gonzalez signed the Rates Agreement and confirmed his understanding of Palace's "pay structure" encompassing a regular rate component and an overtime premium component. This obviates any concern arising from his suggestion that he did not sign or see the 2015, 2016, or 2017 Addendums before filing this lawsuit. Second, Courts do not require employees and employers to have a "mutual understanding" or "express agreement" that the daily shift rate includes an overtime premium component where, as here, the employer did not utilize the "fluctuating workweek" compensation model.

---

[3] As already noted, Gonzalez added that "this has caught me by surprise since I had not seen the documents for 2015, 2016 and 2017." (Gonzalez Dep. 52:24–53:2.) But again, whether he had, or had not, seen the Addendums does not vitiate his concession that Palace paid him the appropriate overtime premium for hours worked in excess of 40 per week. (*Id.*)

10

First, during his deposition, Gonzalez stated that he never saw—and certainly never signed—the pay rate Addendums for 2015, 2016, and 2017. In virtually the same breath, he agreed that he was "paid 40 hours at a regular rate of $8.10 and an overtime rate for 37 hours at $12.15" in 2017, and had no reason to believe that Palace paid him incorrectly in 2015 or 2014. (Gonzalez Dep. 52:20–52:24.) He also admitted that he signed the initial Rates Agreement and that it explained precisely how his compensation encompassed an overtime premium for work in excess of 40 hours per week. In other words, Gonzalez concedes that Palace provided express notice of the overtime premium and paid him accordingly. These acknowledgements erase any significance derived from his assertion that he never signed or saw the Addendums.

Second, claims based on the absence of a mutual understanding or express agreement fail outside the narrow—and inapplicable—"fluctuating workweek" context. *See* 29 C.F.R. § 778.114; *see also Dufrene v. Browning–Ferris, Inc.*, 207 F.3d 264, 268 (5th Cir. 2000) (holding that § 778.114 does not apply to an employer's day rate policy and, accordingly, Plaintiff need not agree to the overtime premium included in his daily rate, or even understand that the daily rate includes an overtime premium). Under the Fair Labor Standards Act, an employer cannot even use the "fluctuating workweek" method of compensation unless it establishes the following criteria:

> (1) the employee's hours fluctuate from week to week;
>
> (2) the employee receives a fixed weekly salary that remains the same regardless of the number of hours worked during that week;
>
> (3) the fixed amount is sufficient to compensate the employee at a regular rate that is not less than the legal minimum wage;
>
> (4) the employer and the employee have a "clear mutual understanding" that the employer will pay the employee the fixed weekly salary regardless of hours worked and that this salary includes an overtime premium.

*See Seraphin*, 2013 WL 940914, at *2; *see also Davis v. Friendly Exp., Inc.*, No. 02-14111, 2003 WL 21488682, at *1 (11th Cir. Feb. 6, 2003). Gonzalez does not allege in his Complaint (or any subsequent filing) that Palace compensated him under a "fluctuating workweek" model. Yet, he relies entirely on cases interpreting the "fluctuating workweek" approach to buttress his "lack of mutual understanding" argument. (*See* Pl.'s Mot. 11 ("Analogously, Plaintiff refers to the test regarding the fluctuating workweek theory, because such deals with a determination of how the employee's wages should be determined for purposes of overtime damages.").)

The Court declines Plaintiff's invitation to adopt this misapplication of law. Contrary to the "fluctuating workweek" compensation model, Gonzalez admittedly received a fixed daily rate—not a fixed weekly salary. And his daily rate pertained to a fixed number of hours. (D.E. 30-1, at 9.) By contrast, the "fluctuating workweek" model applies only where the number of hours worked fluctuates each week while the weekly salary remains constant. Thus, the "fluctuating workweek" approach does not apply here, so Gonzalez has no basis for importing its "mutual agreement" requirement. *See Dufrene*, 207 F.3d at 268 (holding that where employees "are *not* paid a salary for a workweek" but instead "are paid for the number of days they work . . . § 778.114 does *not* apply") (emphasis in original).

## C. Hours Worked Per Week

As a final matter, Gonzalez and Palace at various times reference different totals of paid work hours per week. Palace's Rates Agreement states that 12-hour shifts include "11 working hours" and "60 minutes of breaks"—*i.e.*, "77 working hours per week." (D.E. 30-1, at 9.) However, Gonzalez alleges in his Complaint that he "worked 84 hours per week." (Compl. ¶ 21.) The seven-hour difference stems from the fact that Gonzalez includes the one-hour break per shift in his calculation of "working hours" whereas Palace does not. (D.E 30-1, at 3, ¶ 11 ("I worked 7 days, 12 hour shifts each day . . . [s]uch totals (84) hours.").)

This apparent inconsistency, however, does not create a genuine dispute of material fact for multiple reasons. *See Anderson*, 477 U.S. at 247–48 ("The mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").

First, neither party raises this discrepancy in weekly hours worked at any point. More importantly, Gonzalez's Complaint states only one claim for alleged overtime wage violations: that he did not receive an overtime premium for work in excess of 40 hours per week. Gonzalez never alleges that Palace failed to compensate him altogether for hours he worked. Having failed to include this claim in his Complaint, he could not recover for it (even assuming its validity). Therefore, this potential discrepancy involving total hours worked per week is immaterial.

Second, even if Gonzalez had properly alleged that Palace paid him for only 77 of the 84 hours he worked each week, he has provided no evidence to support such a claim. He did not supply time sheets suggesting he worked seven unpaid hours in even one week—much less in every week for over two years. Furthermore, Gonzalez stated in his deposition that he worked 12-hour shifts from 7:00 A.M. to 7:00 P.M. (Gonzalez Dep. 78:7–78:9.) With that schedule, it would be mathematically impossible for Gonzalez to work 84 hours in a single week unless he never used any of the 60 minutes of unpaid break time built into each 12-hour shift. However, he conceded in his deposition that during each shift, he took "meal breaks" and allocated time "to make calls, go to the bathroom," and deal with his "necessary affairs." (*Id.* at 85:14–85:20.) Based on his own statements, therefore, he could not have worked 84 hours per week.

Accordingly, the discrepancy regarding the total number of hours Gonzalez worked per week does not create a genuine dispute of material fact. *Hickson Corp.*, 357 F.3d at 1260 ("An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.").

## V. **Conclusion**

For the reasons discussed above, it is ADJUDGED that Palace's motion for summary judgment is GRANTED. All other pending motions are DENIED as MOOT and the Clerk shall close the case.

DONE AND ORDERED in Chambers at Miami, Florida, this ___4th___ of January 2018.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record